UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:18 CR 182 HEA / DDN |
| | ) | |
| RODOLFO EMILIO SAENZ, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND RECOMMENDATION

Before the court are the pretrial motions of the parties that were referred to the undersigned United States Magistrate Judge under 28 U.S.C. §636(b).  The motions pending before the court are those by defendant Rodolfo Emilio Saenz to suppress evidence (Docs. 15 oral, and 21) and by the United States for a determination by the court of the admissibility of any arguably suppressible evidence (Doc. 16 oral).  An evidentiary hearing was held on May 18, 2018.

Upon consideration of the testimony given during the hearing and the briefs filed by the parties, the undersigned makes the following findings of fact and conclusions of law:

## FACTS

1.  At approximately 11:35 p.m. on March 6, 2016, Officer Stephen Schue of the St. Louis County Police Department[1] was travelling westbound on Interstate I-44.  He

---

[1] Officer Stephen Schue attended police academy in Missouri which involves a six month training program including 800 hours of training, instruction on traffic violations, traffic stops, and drug interdiction.  Officer Schue is currently an officer with the St. Charles County Police Department and has been in this role for approximately one year.  He previously was a St. Louis County Police Officer for approximately ten years, during which this encounter occurred.  He has made drug traffic stops in the past as a St. Louis County and St. Charles County officer.

initiated a traffic stop of a 2015 Jeep SUV for failure to maintain its lane.[2]  Officer Schue saw the Jeep, which was being driven in lane two, veer side to side into both lanes one and three.  After observing the Jeep being driven in this manner, Officer Schue activated his emergency lights to effect a traffic stop.  The driver of the Jeep vehicle complied with the emergency lights and pulled over to the shoulder of the road and stopped.  Officer Schue stopped his police vehicle behind the Jeep on the shoulder.  Officer Schue got out of his police vehicle and walked up to the Jeep on the passenger side and stood at the front passenger window.  Only the driver was in the vehicle.  Throughout the encounter, light traffic drove past the two stopped vehicles.

2. After the driver rolled down the window, Officer Schue requested the driver's license and proof of insurance and proceeded to explain the reason for the stop.  When looking at the driver's license, Officer Schue learned the driver was Rodolfo Emilio Saenz and resided in El Paso, Texas.  Although Mr. Saenz provided his driver's license, he could not produce any proof of insurance, explaining that the car was a rental car.

3. Officer Schue then requested and was given the rental agreement.  When handing over the rental agreement, Mr. Saenz told Officer Schue that he acquired the rental vehicle in Chicago, Illinois, where he owns a metal business and that he was in transit to Tulsa, Oklahoma, to visit his brother.  After his visit in Tulsa, Mr. Saenz planned to drive back to El Paso.  The car rental was for a one-way trip.[3]

4. Officer Schue then walked to his patrol vehicle to run a records check.  The report did not indicate any wanteds or warrants.  However, the El Paso Intelligence Center database reported that Mr. Saenz was under an ongoing investigation by Illinois

---

[2] Mr. Saenz disputes the reason for the stop, stating that it was for the reason of looking tired.  *See infra* note 7.  The undersigned credits the testimony of Officer Schue about the reason for the traffic stop.

[3] Mr. Saenz disputes that he gave the information voluntarily.  *See infra* note 7.

state police involving cocaine. This computer inquiry lasted approximately ten or fifteen minutes. With the reported information, Officer Schue returned to the Jeep.

5. At the Jeep, Officer Schue stood at the front passenger's door. Consistent with his observation earlier, Officer Schue saw that Mr. Saenz did not make eye contact with him. Rather, he looked straight forward and was fidgeting with his wallet.[4] Officer Schue believed these behaviors demonstrated excess nervousness. He returned the driver's license and paperwork to Mr. Saenz and told him he was not going to issue him a traffic citation.

6. Officer Schue noticed a piece of hand luggage the size of an airplane carry-on bag in the back seat on the passenger's side of the Jeep. The small size of the luggage for such a substantial trip, the one-way vehicle rental, and the driver's lack of eye contact and fidgeting behavior indicated to Officer Schue that criminal activity may be occurring. For this reason, he asked Mr. Saenz if there was anything illegal inside the vehicle of which the officer should be aware. Mr. Saenz said there was nothing illegal in the car. Officer Schue asked if there were any large amounts of cocaine or United States currency in the car to each of which Mr. Saenz replied no. Mr. Saenz opened his wallet and showed Officer Schue that the only money he had in the car was the money in the wallet.

7. Next, Officer Schue asked Mr. Saenz if he could search the vehicle. Mr. Saenz replied orally in the affirmative.[5] A written Consent to Search form was not used to record the driver's consent to the search.

8. To begin the search, Officer Schue asked Mr. Saenz to turn the vehicle motor off, which Saenz did. The officer then opened the rear passenger door, and proceeded to open the previously seen piece of carryon bag. Officer Schue stated to Saenz that the bag felt light to him, to which Mr. Saenz replied that it was light packing

---

[4] Mr. Saenz disputes that he did not make eye contact. *See infra* note 7.

[5] Mr. Saenz disputes that he was asked if Officer Schue could search the vehicle and responded affirmatively. *See infra* note 7.

for a short trip. Upon partially opening the luggage, Officer Schue observed one bundle of United States currency vacuum-packed in a clear plastic wrapping.

   9. Officer Schue then directed Mr. Saenz to remove the keys from the ignition and hand them to him, which was done. Because he believed the bundle of currency could be contraband, Officer Schue then directed Saenz to step out of the vehicle and stand in front of his patrol vehicle.[6] Mr. Saenz complied with these directions. Officer Schue then conducted a patdown search of Saenz's person to locate any weapon; no weapon was found.

   11. Officer Schue then asked Saenz whether there was $60,000.00 in the bundle. Schue made this estimate from his training and experience. In response, Saenz said, "More." Schue asked, "How much?" Saenz replied, "About $750,000.00," and indicating that there was more currency in the trunk of the vehicle.

   12. At that time, Officer Schue called for an assist car and a supervisor, and explained to Saenz the security reason for this. Police Supervisor Sidone arrived with a K-9 unit.

   13. The drug trained canine was walked around the Jeep without opening any door. The canine alerted to the presence of contraband in the trunk of the Jeep by sitting down, although it is not clear what substance the dog identified.[7]

---

[6] Mr. Saenz disputes that the exit from the vehicle was this peaceable. *See infra* note 7.

[7] The testimonies of Officer Schue and Mr. Saenz conflict as to the sequence and description of events up until this point. At the evidentiary hearing, Mr. Saenz testified as follows. Mr. Saenz was driving on Interstate 44 when Officer Schue pulled him over for looking tired or sleepy. His wheels did not touch the lines crossing over into other lanes as Officer Schue claimed was the reason for the stop. Mr. Saenz believed he was pulled over for no reason whatsoever. There were no cars that passed by during the traffic stop. Officer Schue asked for Mr. Saenz's driver's license and insurance, Mr. Saenz told him it was a rental car, and Officer Schue returned to the patrol vehicle with his license and rental agreement. Officer Schue was at the car for about ten to fifteen minutes, when he returned to the Jeep and stood at the front passenger window. Mr. Saenz did not offer information voluntarily, but Officer Schue proceeded to ask questions of Mr. Saenz as where he was going, where he came from, the purpose of his trip, what he does for a living, and where he works, all before handing back his driver's license. Mr. Saenz made eye contact with Officer Schue while Officer Schue was asking questions. Mr. Saenz testified he did not know exactly when Officer Schue handed back the driver's license, but he guessed it was

14. Officer Schue then told Mr. Saenz that, to safeguard everyone, he was moving the traffic stop to the St. Louis County Police Department precinct location in Fenton, Missouri. The specific reasons for the move were to get off the traffic-traveled highway, and to avoid being observed by any motorist who was accompanying Mr. Saenz on the trip. Officer Schue knew from his training and experience that drug traffickers sometimes travel together in separate vehicles. Officer Schue did not feel the need for moving the traffic stop location until he saw the currency in the vehicle.

15. Throughout the traffic stop, Mr. Saenz remained respectful and cooperative. At one time he stated to Officer Schue that he wanted to work something out on the side of the highway, which Officer Schue interpreted as an offer to bribe him. Officer Schue handcuffed Mr. Saenz and placed him in the front seat of his patrol vehicle to transport him to the Fenton precinct. He also notified Mr. Saenz that he was being detained for

---

after asking the questions and confirmed he had the paperwork in his possession before the vehicle search. When handing over the driver's license and rental agreement, Officer Schue did not make it clear that Mr. Saenz was free to leave. Mr. Saenz believed he had to stay, because Officer Schue was still asking questions. Officer Schue then opened the rear passenger side door and stated "I'm going to search your vehicle. It's alright with you, right?" Mr. Saenz did not respond, Officer Schue repeated the question, and Mr. Saenz remained silent. Officer Schue then asked "It is okay with you if I search your luggage?" Mr. Saenz asked why he wanted to search the luggage, but he did not expressly state that Officer Schue could search the vehicle. Officer Schue proceeded to open the luggage, find the money, and tell Mr. Saenz to get out of the vehicle.

Mr. Saenz's testimony conflicts with Officer's Schue's about how he came to exit the car. Four or five other law enforcement cars arrived to assist, and an hour later, the canine unit arrived.

Where their testimonies differ, the undersigned finds Officer Schue's testimony more credible than that of Mr. Saenz, because of Officer Schue's law enforcement training and experience, and because of the inconsistencies in Saenz's testimony, his admission of having money in the luggage, and his incentive to have this evidence ruled inadmissible. Saenz first testified that Officer Schue pulled him out of the vehicle by physically putting hands on him. Mr. Saenz also testified that a lesser amount of force was used by the officer and that Officer Schue asked him to exit the vehicle and then handcuffed him. Later, during the early hours of March 7, Officer Schue gave Department of Homeland Security Special Agent Haferkamp information about the incident that was similar to his suppression hearing testimony. Thus, the undersigned credits the testimony of Officer Schue over that of Mr. Saenz where their hearing testimonies differed.

further investigation but was not under arrest. Officer Schue drove them to the Fenton precinct.

16. Next, Officer Schue contacted the federal Department of Homeland Security. Special Agent Duane Haferkamp and a federal Task Force Officer, Det. Andrew Dacey, responded, arriving at the Fenton precinct around 1:30 a.m. on March 7, 2016. After the agents arrived, Officer Schue told them what had occurred. Officer Schue also told them that Saenz had indicated he wanted to cooperate with law enforcement.

17. Agent Haferkamp opened the trunk of the Jeep vehicle in the presence of Officer Schue. Before that time, the Jeep had not been searched. They saw two empty duffel bags in the back cargo area. On top of the duffel bags was the molding that would be placed in the spare tire wheel. They removed it and observed multiple bundles of U.S. currency that looked similar to the one in the suitcase. The currency was seized by the Homeland Security agents and then counted. The total amount was $748,320 and five counterfeit $20 bills.

18. After the currency was seized, Agent Haferkamp interviewed Saenz inside the precinct office with Det. Dacey present. All parties sat at a table in an interrogation room, the door of which was kept open. Agent Haferkamp first made sure Mr. Saenz could speak and read English and was of clear mind. After he assured himself of this, Agent Haferkamp orally advised Saenz of his constitutional rights to remain silent and to counsel. A Statement of Rights form, on which were stated the constitutional rights to counsel and to remain silent, was presented to Saenz. Beneath the following printed language, Saenz signed his name:

## **WAIVER**

> I have read, or someone has read to me, this statement of my rights [(set forth above in printing)] and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present.

Beneath Saenz's signature, Agent Haferkamp and Det. Darsey signed their names. (Gov. Ex. 1).

Saenz indicated that he would speak with the law enforcement officers without a lawyer present. His demeanor was very cooperative.

19. Thereafter, in the interview, Saenz stated he was willing to continue with his trip and to make a controlled delivery of the currency. Saenz made a consensual undercover phone call.

20. Agent Haferkamp asked Saenz whether he would consent to the agent searching his cell phone. Saenz agreed and signed a Computer Forensics Consent Worksheet, Government Exhibit 2. By signing this form, Saenz expressly, voluntarily consented to the search of his "electronic equipment." (Gov. Ex. 2).

21. Saenz was ultimately released from custody with his Jeep on March 7, 2016. The controlled delivery of the currency did not occur.

## **DISCUSSION**

In support of his written motion to suppress, defendant argues that on March 6, 2016, the police stop, his arrest, the seizure of evidence, and his statements were done in violation of his rights under the Fourth and Fourteenth Amendments to the Constitution. (Doc. 21). The undersigned disagrees.

### *The Traffic Stop*

The initial stop of defendant driving his Jeep was lawful. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation and particularly describing the place to be searched, and the persons or things to be seized.

U. S. CONST. amend IV. Under the Fourth Amendment, an officer who observes a traffic violation, even a minor one, has reasonable grounds to initiate a traffic stop. *Rodriguez v. United States*, 135 S.Ct. 1609, 1614 (2015). In defendant Saenz's case, St. Louis County Police Officer Schue lawfully stopped defendant's Jeep, because he saw the

vehicle fail several times to remain in one lane.  Weaving from lanes 1 to 3, and not remaining in lane 2, was a violation of the Missouri State Traffic Code.  *See* Rev. Stat. Mo. § 304.015.5.1.  The authority of an officer following the initiation of the traffic stop is limited.

> A seizure for a traffic violation justifies a police investigation of that violation.  A relatively brief encounter, a routine traffic stop is more analogous to a so-called *Terry* stop than to a formal arrest.  Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission--to address the traffic violation that warranted the stop.  Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose.  Authority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed.
>
> . . . .
>
> Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop.  Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.  These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

*Rodriguez*, 135 S.Ct. at 1614-15 (internal quotation marks and citations omitted).  Officer Schue spent a reasonable time addressing the traffic violation that warranted the stop.  He obtained Saenz's driver's license and rental car information, then inspected these documents against electronic databases to ensure that both the driver and the vehicle were lawfully on the road.  His inquiries about the purpose of Saenz's trip were those ordinarily incident to a traffic stop and related to the underlying traffic code violation.  The duration between the initial stop and the return of Saenz's documents – approximately fifteen to twenty minutes – was reasonable, and from the initial stop until the return of Saenz's documents, Officer Schue acted within the confines of his limited authority under *Terry v. Ohio*, 392 U.S. 1 (1968).

### *Basis for Further Investigation*

After Officer Schue returned the driver's license and paperwork to Saenz, the officer continued his conversation with defendant, asking him whether there was anything in the vehicle that was illegal. This further questioning was based not on the initial traffic violation but rather on reasonable suspicion of other criminal activity. Relevant to these facts, the Supreme Court continued its discussion in *Rodriguez* of the parameters of lawful investigation after the reason for the traffic stop ended:

> In both [*Illinois v. Caballes*, 543 U.S. 405 (2007), and *Arizona v. Johnson*, 555 U.S. 323 (2009),] we concluded that the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention. In *Caballes*, however, we cautioned that a traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a warning ticket. And we repeated the admonition in *Johnson*: The seizure remains lawful only so long as unrelated inquiries do not measurably extend the duration of the stop. An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But, contrary to Justice Alito's suggestion, he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.

*Id.* at 1614-15 (internal quotation marks and citations omitted).

Once Officer Schue finished the tasks associated with the traffic stop and informed Saenz he would not be issuing a citation, the purpose of the traffic stop was complete and "further detention would be unreasonable unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify further detention." *United States v. Fuehrer*, 844 F.3d 767, 772–73 (8th Cir. 2016). Something did occur. Officer Schue's continued questioning of Saenz was based on the inconsistency of Saenz's story with his one-way car rental and small luggage, Saenz's nervous fidgeting and extreme avoidance of eye contact, and the information that Officer Schue obtained during the records check at his patrol vehicle. These circumstances generated reasonable suspicion justifying further limited investigative detention. *See, e.g., United States v. Murillo-Salgado*, 854 F.3d 407, 415-16 (8th Cir. 2017) (holding that vehicle occupants providing inconsistent stories supported reasonable suspicion that warranted further

investigation).  Accordingly, the further investigation was not an impermissible extension of the traffic stop under *Rodriguez*, but rather an unrelated detention warranted by reasonable suspicion arising during the course of the traffic stop.

### *Consent to Search Vehicle*

Officer Schue then asked Saenz if he could search the vehicle, to which Mr. Saenz responded affirmatively.  The evidence shows this consent was voluntarily given.  To assess voluntariness, courts consider a person's (1) age; (2) general intelligence and education; (3) whether the subject was intoxicated or under the influence of drugs; (4) whether he consented after being informed of his right to withhold consent or of the *Miranda* rights; and (5) whether, because the subject had previously been arrested, he was aware of the protections afforded to suspected criminals by the legal system. *United States v. Chaidez*, 906 F.2d 377, 380-81 (8th Cir. 1990).  Courts also examine the environment in which consent was given: whether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened or physically intimidated; (3) relied upon promises or misrepresentations by police; (4) was in custody or under arrest when the consent was given; (5) was in a public or secluded place; or (6) either objected to the search or stood by silently while the search occurred. *Id.*

Considering the totality of the circumstances, Saenz gave consent to search the entire car freely and voluntarily.  Officer Schue did not intimidate Mr. Saenz or make any promises to obtain consent, nor did the officer make any misrepresentations. Consent was obtained very soon after the traffic stop, after Saenz had been detained no more than fifteen to twenty minutes.  They were in a public place.  Saenz did not appear confused or impaired, and he did not attempt to withdraw consent at any time.

The scope of this consent extended to the suitcase on the rear seat.  "[A]n officer may reasonably interpret a suspect's unqualified consent to search a vehicle for drugs to include consent to, inter alia: search containers within that car which might bear drugs; probe underneath the vehicle; and open compartments that appear to be false, or puncture such compartments in a minimally intrusive manner." *United States v. Lopez-Mendoza,*

- 10 -

601 F.3d 861, 867 (8th Cir. 2010) (internal citation omitted). Officer Schue opened the rear passenger door, noted the lightness of the luggage, and began to open the luggage. At no point did Mr. Saenz object to the officer's clear intent to search the luggage, instead replying that he had packed light for a short trip. A reasonable person would have understood by this exchange that Saenz consented to the search of the luggage within the car. *See id.*

Following Officer Schue's discovery of the vacuum-packed currency and Saenz's admission that there was $750,000 in the trunk of the vehicle, the officer called for an assist car and moved the investigation to the police station. He informed Saenz he was not under arrest but was being detained for further investigation. At this point, the search of the car continued, and officers found the duffel bags containing the spare tire molding and the remaining bundles of currency. Mr. Saenz's consent to search the vehicle was unqualified and the officer's search of the vehicle and the luggage inside it was lawful. At no time – whether on the side of the road, on the way to the police station, or at the police station – did Mr. Saenz revoke his consent or object to moving his rental car to the police station to complete the search. *See, e.g., United States v. Barragan*, 379 F.3d 524, 530 (8th Cir. 2004).

### *Interrogation*

An individual in custody must be informed of his constitutional rights to remain silent and to counsel prior to questioning. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). If, after receiving Miranda warnings, a defendant waives these rights and agrees to make a statement, the government must show by a preponderance of the evidence that the waiver was knowing, voluntary, and intelligent. *Colorado v. Connelly*, 479 U.S. 157, 169-70 (1986). A waiver is knowing if it is made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011) (citations omitted). It is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* (citations omitted). This determination must be made based

upon an examination of the totality of the circumstances surrounding the interrogation. *Id.* at 482.

Although Saenz had been handcuffed during the transport and was being interviewed at the police station by multiple officers, his demeanor was very cooperative. He signed a waiver claiming he was informed of and understood his rights and was nevertheless willing to answer questions outside the presence of a lawyer. The evidence shows that this waiver was made knowingly and voluntarily: the officers made sure Mr. Saenz could speak and read English and had a clear mind. The officers then orally advised Saenz of his constitutional rights to counsel and to remain silent. They kept the door of the room open and did not make any promises or misrepresentations to obtain this waiver. Saenz did not appear confused or impaired, and he did not attempt to withdraw the waiver at any time. The custodial interrogation was lawful.

### *Consent to Search Cell Phone*

During the interrogation, Saenz gave his consent to search his cell phone, signing a Computer Forensics Consent Worksheet. For the same reasons supporting the voluntariness of defendant's *Miranda* waiver, the consent to search his phone was also voluntarily made. *See also United States v. Chaidez*, 906 F.2d *at* 380-81. Evidence obtained as a result of Saenz's express, voluntary consent to search his electronic equipment should not be suppressed.

### **CONCLUSION**

For the reasons set forth above,

**IT IS HEREBY ORDERED** that the oral motion of the United States for a determination of the admissibility or not of any arguably suppressible evidence (Doc. 16) **is denied** as mooted by the proceedings held on the defendant's motions to suppress.

**IT IS HEREBY RECOMMENDED** that the motions of defendant Rodolfo Emilio Saenz to suppress evidence (Docs. 15 and 21) **be denied.**

The parties have 14 days to file written objections to this Order and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

<u>    /s/ David D. Noce    </u><br>
**UNITED STATES MAGISTRATE JUDGE**

Signed on July 18, 2018.